# CAROL L. ISHAM *v.* F. LANCE ISHAM
## (SC 18270)

Rogers, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

Argued March 17—officially released June 23, 2009

*Steven D. Ecker*, with whom, on the brief, was *Jennifer L. Sachs*, for the appellant (plaintiff).

*Trisha M. Morris*, with whom was *Howard A. Jacobs*, for the appellee (defendant).

*Opinion*

KATZ, J. The plaintiff, Carol L. Isham, appeals[1] from the decision of the trial court, denying her motion to,

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

inter alia, find the defendant, F. Lance Isham, in contempt of the judgment dissolving the parties' marriage for improperly basing his alimony payments to the plaintiff on his "salary" only, rather than on his employment "income," which includes bonus compensation, and to establish a payment schedule to satisfy the amount that the defendant had underpaid. The plaintiff claims that the trial court improperly determined that the alimony provision in the parties' separation agreement (agreement) was clear and unambiguous and did not include the defendant's bonuses. She also claims that the trial court improperly refused to permit the introduction of extrinsic evidence concerning the parties' intent with respect to the alimony provision. We conclude that the trial court improperly determined that the agreement was unambiguous, and we therefore reverse the judgment and remand for further proceedings.

The record reveals the following undisputed facts and procedural history. After twenty-nine years of marriage, the parties were divorced on March 9, 1993, in an uncontested hearing before the trial court, *Karazin, J.* At the hearing, the plaintiff's counsel, Christine O'Sullivan, indicated that the parties had reached an agreement and, without objection, requested that it be put on the record orally. The court agreed, and O'Sullivan recited the agreement into the record.

Although the agreement also disposed of the parties' real property, certain items of personal property and the defendant's retirement accounts, this appeal centers on the provisions requiring the defendant to pay alimony to the plaintiff. As read into the record, the agreement specified that the defendant would provide alimony to the plaintiff throughout her lifetime in "the sum of $150,000 for the first year, and $160,000 for the next two years following the date of the divorce, and $150,000 [per year] thereafter . . . ." The agreement also provided a provision for the automatic adjustment

of alimony, an issue of central importance in this appeal, which was recited into the record as follows:

"[O'Sullivan]: . . . In the event that the [defendant's] *salary* shall increase by $100,000 over the current level, then his obligation shall increase by $20,000 to the [plaintiff] at that time. In the event that his salary shall decrease by $100,000, then his obligation to the [plaintiff] shall be reduced by $10,000. There is a provision, however, that if the [defendant's] salary shall be reduced below the level of $325,000, then he shall be free to seek a downward modification of his obligation for support.

"The Clerk: I'm sorry, I just need to get one thing.

"The Court: Sure.

"The Clerk: The sentence where the *salary* increases over $100,000, I didn't get that.

"[O'Sullivan]: For every $100,000 that [the defendant] gets an increase, [the plaintiff] gets $20,000. If his *income* should decrease by $100,000, his obligation for alimony decreases by $10,000.

"The Court: We're going to order the transcript, so just get sum and substance.

"[O'Sullivan]: We did indicate that if his salary should decrease below $325,000, that he can come back to the court to seek a downward modification. Upon retirement of the [the defendant], the [plaintiff] shall receive the lesser of: (A) one half of the [defendant's] pension income, or (B) her then current alimony. All obligations for support and maintenance of the [plaintiff] shall cease upon the death of the payor, the death of the payee, remarriage or one year cohabitation." (Emphasis added.)

Notably, the agreement set forth no definitions for the terms used therein. At the conclusion of the recitation of

the agreement into the record, the trial court canvassed the parties as to whether they understood the agreement and whether they believed that it was fair and reasonable under the circumstances, to which both parties responded in the affirmative, and as to whether they had any questions concerning the agreement, to which they both responded in the negative. In accordance with their responses, the court expressly found that the agreement was fair and reasonable under the circumstances, that the parties had concurred in this assessment and that both parties had been represented by counsel. The court ordered the transcript of the hearing to be placed in the file and, stating that the transcript would be treated as a separation agreement, ordered that it be incorporated by reference into the decree of dissolution. The court did not order, nor did the parties request, that only certain portions of the transcript be designated as the separation agreement.

At the time of the dissolution in 1993, the defendant's employment compensation package consisted of an annual salary of $500,000, on which his presumptive "base" alimony obligation of $150,000 had been set, and various retirement plans; he did not receive any bonuses.[2] In 1996, however, his compensation package changed to include bonuses and stock options. His 1996 W-2 form reflected wages of $573,132, of which the defendant claims $500,000 was designated as salary, and he paid $160,000 in alimony. His 1997 W-2 form reflected wages of approximately $1.3 million, of which the defendant claims $646,154 was designated as salary, and he paid $167,319 in alimony. His 1998 W-2 form reflected wages of approximately $1.4 million, of which

[2] At the time of the dissolution, the defendant was employed by Polo Ralph Lauren Corporation. The defendant testified at the hearing on the contempt motion that his employment with Polo Ralph Lauren Corporation began in 1981 as a salesman and continued through his retirement from the board of directors in September, 2004.

the defendant claims $757,692 was designated as salary, and he paid $190,000 in alimony. His 1999 W-2 form reflected wages of approximately $1.15 million, of which he claims $900,000 was designated as salary, and he paid $222,707 in alimony. From 2000 to 2003, the defendant's W-2 forms, as amended, and/or his federal 1040 form reflected wages of approximately $1.47 million, $3.1 million, $1.66 million and $6.58 million, respectively, of which he claimed $900,000 was annual salary, and he maintained his alimony payment for all four years at $230,022. Finally, in 2004, the year that the defendant retired, his 2004 W-2 form reflected wages of approximately $4.25 million, of which he claims approximately $225,000 was designated as salary, and he paid $219,434 in alimony.

The plaintiff filed a motion dated December 11, 2001 (contempt motion) seeking, inter alia, to: (1) hold the defendant in contempt for failing to comply with his alimony obligations under the 1993 dissolution decree; (2) modify the agreement incorporated into that decree to reflect the defendant's current annual compensation and commensurate alimony obligation; (3) compel the defendant to produce his tax returns from 1993 to the date of the contempt motion to ascertain the amount of the arrearage; and (4) set a payment schedule to satisfy the arrearage. The basis of the plaintiff's motion was her contention that the agreement had provided that her alimony would increase by 20 percent for every increase of $100,000 in the defendant's "salary/income." She claimed that the defendant had received both salary and bonus compensation as income but improperly had based his alimony payments on his salary only.

Prior to the hearing on the contempt motion, the plaintiff disclosed her intent to introduce expert testimony from Edward Axelrod, a certified public accountant, to establish that the alimony arrearage that had accrued was more than $2.9 million, not including statu-

tory interest. She later expanded the scope of his proffered testimony to include the meaning ascribed to the terms "salary" and "income" by experts and laypeople, including the parties to the present case in the context of their agreement. The defendant moved to preclude this testimony, claiming that the interpretation of the agreement and the intent of the parties at the time that they entered into the agreement addressed the ultimate issue to be decided by the trier of fact, which is not a proper subject of expert testimony.

The trial court, *Hon. Dennis F. Harrigan*, judge trial referee, heard argument on the defendant's motion to preclude immediately prior to hearing argument on the contempt motion, during which the plaintiff's counsel in that proceeding explained: "Axelrod is not being offered to interpret this agreement, Your Honor, or to offer testimony as to the intent of the parties. . . . He is being offered to present testimony to the court as to the use of the word[s] salary and income in his experience as a licensed certified public accountant of many years experience and how the use of those words applies to [the defendant's] understanding of the agreement. And finally, to provide calculations with respect to the arrears that [the plaintiff] claims that she is owed." The trial court granted the motion to preclude on the ground that the expert testimony addressed the ultimate issue of the interpretation of the agreement.

The trial court then turned to the contempt motion and heard testimony from both parties and the defendant's accounting expert, Kenneth J. Pia, Jr. The trial court permitted the defendant to testify, over the plaintiff's objection, that he had interpreted his alimony obligations under the agreement to be limited to his salary.[3]

---

[3] The defendant testified on direct examination by the plaintiff's counsel as to the amount of his wages and other compensation as reflected on his W-2 forms during the relevant years. Immediately thereafter, the plaintiff's counsel queried the defendant about his interpretation of his alimony obligations, as set forth in the following colloquy:

The court did not permit, however, the defendant to testify regarding his intent at the time the parties entered into the agreement. The trial court also refused to permit the plaintiff to testify regarding her understanding of the agreement or her intent at the time the agreement was formed.[4] Pia was permitted to provide

"[The Plaintiff's Counsel]: In your interpretation of the separation agreement your ex-wife does not share in your deferred compensation, is that correct?

"[The Defendant's Counsel]: I will object. It speaks for itself.

"[The Plaintiff's Counsel]: It speaks for itself? I don't know that it speaks for itself, Your Honor. We have a very ambiguous and undefined separation agreement. I am attempting to get clarity from the witness as to his understanding so that the court can hear both sides and make a determination as to the court's interpretation of the agreement.

"[The Defendant's Counsel]: The agreement is clear. The interpretation of the parties is not relevant to the agreement. The agreement is what it says it is. And the agreement is here. It is part of the judgment. It was canvassed by Judge Karazin at the time and this is the agreement of the parties. It is not what the parties think the agreement is or what they think maybe it should have been. But the question is this is the agreement and this is the agreement that the parties have to live by and everybody has to live by . . . . And for him to inquire as to what the parties meant or what they intended, goes beyond the scope of this case and would be incompetent.

"The Court: The objection is overruled. You may answer. . . .

"[The Defendant]: It wasn't in existence.

"[The Plaintiff's Counsel]: But your understanding of the agreement . . . is that [the plaintiff] does not share in deferred compensation, isn't that correct?

"[The Defendant]: Absolutely. . . .

"[The Plaintiff's Counsel]: And she does not share in bonuses, is that correct?

"[The Defendant]: Absolutely. . . .

"[The Plaintiff's Counsel]: You understand your interpretation of the agreement is that [the plaintiff] shares in nothing but your salary, is that correct?

"[The Defendant]: Correct."

[4] For example, during the direct examination of the plaintiff by her counsel, the following colloquy occurred:

"[The Plaintiff's Counsel]: . . . [W]hat does the word salary mean to you in the agreement?

"[The Defendant's Counsel]: Objection.

"[The Plaintiff's Counsel]: I claim it, Your Honor.

"[The Defendant's Counsel]: I object to it. This is an agreement of the parties. That is exactly what you ruled on in connection with my motion

general definitions of salary and income, but the trial
court sustained objections concerning his understand-
ing of the meaning of those terms within the agreement.

Following the hearing, the trial court issued a memo-
randum of decision denying the plaintiff's contempt
motion. The court began with a recitation of the
agreement as read into the record, including the various
questions and responses. The court concluded that the
agreement unambiguously linked alimony increases to
increases in salary and that salary did not include
bonuses. It first noted that the references to increases
in alimony were in a paragraph that referred only to
salary. The court further noted that salary was the only
form of employment compensation that the defendant
had been receiving at the time of the dissolution. The
court disagreed with the plaintiff's claim that the words
salary and income were used interchangeably in the
agreement, stating: "The word salary is directed to the
court. The word income is directed to the [court clerk]

[to preclude], the first motion you dealt with here. The parties' own interpre-
tation of what the agreement means is not relevant in this case. It is a
decision for the court to make. It is not for the party to come back fifteen
years later and say this is what I was thinking about because then we have
no finality to the judgment here. It is not for her to say this is what I
thought it meant. This is what it is. This is what she was canvassed on. Her
independent thoughts arrived at fifteen years later are not only irrelevant
but incompetent.

"[The Plaintiff's Counsel]: If I may be heard, Your Honor. The agreement
references the word salary and income interchangeably. . . .

"[The Court]: Excuse me, that is not correct. It says what it says and you
don't have to tell me what it says. And I don't think this witness does either.
The objection is sustained. . . .

"[The Plaintiff's Counsel]: Mrs. Isham, what does the word income mean
to you in your separation agreement?

"[The Defendant's Counsel]: Object for the same reason.

"[The Court]: Sustained.

"[The Plaintiff's Counsel]: What was your understanding of your separation
agreement . . . ?

"[The Defendant's Counsel]: Object to it.

"[The Court]: Sustained."

who uses the word salary in making her inquiry. Her inquiry is not a part of the settlement terms. It is her effort to reflect the accuracy of the oral provisions in the transcription." Finally, the court concluded that the term salary means "fixed compensation for services, paid to a person on a regular basis," in accordance with its common meaning, citing two dictionary definitions, and that the term does not include other forms of income, such as bonuses. Accordingly, the trial court denied the plaintiff's contempt motion, and this appeal followed.

On appeal, the plaintiff claims that the trial court improperly: (1) determined that the alimony provision in the parties' agreement was clear and unambiguous and did not include the defendant's bonuses; and (2) refused to permit the introduction of extrinsic evidence concerning the parties' intent with respect to the alimony provision. In connection with the second claim, the plaintiff specifically contends that the trial court improperly precluded both parties from testifying as to their intent at the time the agreement was formed and the plaintiff's expert, Axelrod, from testifying to the meaning of the words salary and income as they are used in various contexts.

We begin our analysis with the plaintiff's claim addressing the interpretation of the agreement's provision to adjust alimony automatically, as the resolution of that issue will influence the outcome of her claim that the trial court improperly excluded extrinsic evidence to determine the parties' intent.[5] See *Poole* v.

---

[5] The plaintiff also claims that the underlying facts demonstrate the parties' intent to include bonuses and other employment compensation earned by the defendant and therefore that she is entitled to a judgment in her favor. We disagree. We note that this contention is subsumed by the plaintiff's second claim relating to extrinsic evidence that the trial court did not consider and, moreover, requires a factual determination that necessitates a remand of the case for further proceedings.

*Waterbury*, 266 Conn. 68, 89, 831 A.2d 211 (2003) ("[e]xtrinsic evidence is always admissible . . . to explain an ambiguity appearing in the instrument" [internal quotation marks omitted]). The plaintiff claims that settled law in this state recognizes that the undefined term salary in a separation agreement is dependent upon the context in which it is used. She also contends that the terms salary and income were used interchangeably in the agreement, and that, under these circumstances, salary may be read broadly to include bonuses. The defendant contends that the term salary, when afforded its ordinary and common meaning, is limited to fixed and regular compensation in accordance with this court's decision in *Silver* v. *Silver*, 170 Conn. 305, 308, 365 A.2d 1188 (1976), and does not include bonus compensation. He further contends that the terms salary and income were not used interchangeably in the agreement. We agree with the plaintiff.

It is well established that a separation agreement that has been incorporated into a dissolution decree and its resulting judgment must be regarded as a contract and construed in accordance with the general principles governing contracts. *Issler* v. *Issler*, 250 Conn. 226, 234–35, 737 A.2d 383 (1999). When construing a contract, we seek to determine the intent of the parties "from the language used interpreted *in the light of the situation of the parties and the circumstances connected with the transaction.* . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Emphasis added; internal quotation marks omitted.) Id., 235. "When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Extrinsic evidence is always admissible, however, to explain an

ambiguity appearing in the instrument. . . . *Hare* v. *McClellan*, 234 Conn. 581, 597, 662 A.2d 1242 (1995)." (Citation omitted; internal quotation marks omitted.) *Poole* v. *Waterbury*, supra, 266 Conn. 89. "When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact." (Internal quotation marks omitted.) *O'Connor* v. *Waterbury*, 286 Conn. 732, 743, 945 A.2d 936 (2008). When the language is clear and unambiguous, however, the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law. *Issler* v. *Issler*, supra, 235.

The threshold determination in the construction of a separation agreement, therefore, is whether, examining the relevant provision in light of the context of the situation, the provision at issue is clear and unambiguous, which is a question of law over which our review is plenary. See *Allstate Life Ins. Co.* v. *BFA Ltd. Partnership*, 287 Conn. 307, 313, 948 A.2d 318 (2008) (determination of whether contract provision is clear and unambiguous is question of law). "Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion . . . ." (Internal quotation marks omitted.) *Levine* v. *Advest, Inc.*, 244 Conn. 732, 746, 714 A.2d 649 (1998). The proper inquiry focuses on whether the agreement on its face is reasonably susceptible of more than one interpretation. Id.; see also *Poole* v. *Waterbury*, supra, 266 Conn. 96 (agreement is ambiguous when language of agreement is susceptible to more than one reasonable interpretation). It must be noted, however, that "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Eckert* v. *Eckert*, 285 Conn. 687, 692, 941 A.2d 301 (2008). "A court will not torture words to import

ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) Id. Finally, "in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Internal quotation marks omitted.) *O'Connor* v. *Waterbury*, supra, 286 Conn. 743.

In the context of a settlement agreement, this court has stated that "[t]he word salary is neither a word of art nor one of strict or narrow meaning. . . . [T]he meaning of the word is not inflexible . . . [and] [t]he conflicting meanings given depend upon the context in which the word salary was used. . . . [Therefore] the language of the judgment itself must be construed." (Citation omitted; internal quotation marks omitted.) *Silver* v. *Silver*, supra, 170 Conn. 308. In *Silver*, this court was required to construe the undefined term salary as part of a settlement agreement to determine whether it included bonuses. Id. Critically, the court recognized that the context in which the term salary was used was essential in determining the intent of the parties and that, in fact, the meaning of the term was not on its face clear and unambiguous but reasonably admitted of more than one meaning. Id. Examining the word salary in the context of the settlement agreement as a whole, the court in *Silver* noted that the calculations of initial alimony were consistent with a fixed definition of salary that did not include bonuses and that the terms salary and gross income were used expressly for different purposes within the agreement. Id., 309. Recognizing that the agreement intentionally had distinguished between salary and gross income, this court concluded that the term salary in the context

of that particular settlement agreement meant only fixed compensation and did not include bonuses. Id.; cf. *Issler* v. *Issler*, supra, 250 Conn. 236–39 (examining agreement to determine how parties had intended term "gross earnings" to be calculated and rejecting plaintiff's claim that "gross earnings" for particular year should be calculated by reference to defendant husband's taxable income).

With these principles in mind, we turn to the agreement in the present case. The term salary was not defined in the agreement, and, indeed, both salary and income were used in relation to the defendant's alimony obligations. Specifically, O'Sullivan, the plaintiff's counsel at the time of the dissolution hearing, initially had used the term salary as the basis on which the defendant's alimony obligations were fixed.[6] When questioned by the court clerk, however, O'Sullivan used the term income as the basis for fixing the alimony obligation.[7] Although the parties understood that O'Sullivan was reading the agreement into the record and that the agreement, as read, was going to be incorporated into the judgment, neither party nor their respective counsel objected to the use of the word income, nor sought to designate only certain portions of the transcript as the agreement. Therefore, the trial court had no legal basis to disregard the presence of the term income in the agreement simply because its use was

---

[6] As we previously have noted, O'Sullivan's initial recitation of the agreement stated: "In the event that the [defendant's] salary shall increase by $100,000 over the current level, then his obligation shall increase by $20,000 to the [plaintiff] at that time. In the event that his salary shall decrease by $100,000, then his obligation to the [plaintiff] shall be reduced by $10,000. There is a provision, however, that if the [defendant's] salary shall be reduced below the level of $325,000, then he shall be free to seek a downward modification of his obligation for support."

[7] As we previously have noted, O'Sullivan responded to the court clerk's request as follows: "For every $100,000 that [the defendant] gets an increase, [the plaintiff] gets $20,000. If his *income* should decrease by $100,000, his obligation for alimony decreases by $10,000." (Emphasis added.)

prompted by an exchange with the court clerk. See *Issler* v. *Issler*, supra, 250 Conn. 239–40 (noting each provision of agreement must be given effect; agreement not to be construed so as to render provisions superfluous); *Barnard* v. *Barnard*, 214 Conn. 99, 111–12, 570 A.2d 690 (1990) (construing term "college" in agreement in context of other provisions).

In light of this interchangeable use of the terms, both interpretations of the term "salary"—to include or to not include bonuses—are plausible. See *Poole* v. *Waterbury*, supra, 266 Conn. 96 (when language of agreement is susceptible to more than one reasonable interpretation, agreement is ambiguous); *Bijur* v. *Bijur*, 79 Conn. App. 752, 761, 831 A.2d 824 (2003) (relevant provision that could be interpreted reasonably in two different ways was inherently ambiguous); *Baldwin* v. *Baldwin*, 19 Conn. App. 420, 422–23, 562 A.2d 581 (1989) (agreement ambiguous when term "income" undefined). When examining the agreement in the present case in its entirety, including the reference to income, it is not clear and unambiguous whether the term salary was intended to reference only the defendant's regular payments from his employment or whether it was intended to have a broader meaning that would encompass any income from his employment. See *Russell* v. *Russell*, 95 Conn. App. 219, 222–23, 895 A.2d 862 (2006) (use of term "expenses for . . . completion" of son's treatment at medical facility not clear and unambiguous in light of provision referencing payment of "all college expenses" of other son). We conclude, therefore, that the trial court improperly determined that the agreement clearly and unambiguously linked the defendant's alimony payments to salary increases and that the term salary had a specific, narrow meaning.

The defendant contends that this court's decision in *Silver* necessitates a rigid interpretation of the word salary, meaning fixed compensation to be paid regularly

for services. As our prior discussion of *Silver* demonstrates, however, the defendant's reliance on this case to mandate a fixed, narrow construction of salary is misplaced. Indeed, in light of the fact that the lack of a definition necessitated a contextual analysis in *Silver*, had the parties in the present case intended a narrow definition of salary, it was well within their abilities to provide such a definition within the text of the agreement. As the defendant's counsel conceded at oral argument in this court, when searching for a party's intent in a separation agreement, it is appropriate to look to the circumstances of the parties at the time the agreement is formed.

Our conclusion that the trial court improperly determined that the agreement was clear and unambiguous inexorably leads us to conclude further that the trial court improperly excluded extrinsic evidence to determine the parties' intent with respect to the meaning of salary and income in the context of their agreement. As we previously have noted, "[e]xtrinsic evidence is always admissible . . . to explain an ambiguity appearing in [an] instrument." (Internal quotation marks omitted.) *Poole* v. *Waterbury*, supra, 266 Conn. 89. Indeed, "[t]he intention of the parties manifested by their words and acts is essential to determine the meaning and terms of the contract and *that intention may be gathered from all such permissible, pertinent facts and circumstances.*" (Emphasis added; internal quotation marks omitted.) Id., 97. At the hearing on the contempt motion, the plaintiff's counsel attempted to elicit testimony from both parties with respect to their intent at the time of the formation of the agreement, but the trial court refused to permit such testimony. See, e.g., footnote 4 of this opinion. The exclusion of this testimony was improper, and a remand is required for a factual determination of the parties' intent.

We do not agree, however, with the plaintiff that the trial court improperly excluded Axelrod's expert testimony. The decision to admit expert testimony is within the discretion of the trial court, and the court's decision will not be disturbed unless there was an abuse of that discretion. *State* v. *Beavers*, 290 Conn. 386, 414, 963 A.2d 956 (2009). As a general matter, "expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) Id. There is no indication that Axelrod had personal knowledge either of the parties' negotiations or of their intent at the time they formed their agreement. Cf. *Marcus* v. *Marcus*, 175 Conn. 138, 145, 394 A.2d 727 (1978) (harmless error to preclude opinion of accounting expert, who had worked with defendant husband to calculate income just prior to formation of settlement agreement, on meaning of "income" in accountancy custom and usage when letter from expert to defendant was admitted to establish expert's understanding of financial terms of agreement). The plaintiff has offered no case law in which expert testimony was required to assist the finder of fact in understanding the general meanings of the terms salary and income.[8] Indeed, it is well established that, "[a]lthough expert testimony may be admissible in many instances, it is required only when the question involved goes beyond the field of the ordinary knowledge and experience of the trier of fact." *Allison* v. *Manetta*, 284 Conn. 389, 405, 933 A.2d 1197 (2007).

Finally, the interpretation of the meaning of the terms salary and income in the context of the agreement is,

---

[8] Although the trial court permitted Pia, the defendant's accounting expert, to testify as to general meanings of the pertinent terms, it is clear that, on remand, the defendant would be bound by the same limitations as the plaintiff.

in fact, the ultimate issue before the court. *State* v. *Finan*, 275 Conn. 60, 66, 881 A.2d 187 (2005) ("an ultimate issue [is] one that cannot reasonably be separated from the essence of the matter to be decided [by the trier of fact]" [internal quotation marks omitted]). It is well established that "expert opinion as to the ultimate issue in a case is admissible only when necessary for the trier of fact to make sense of the proffered evidence, rendering the 'situation . . . of such a nature as to require an expert to express an opinion on the precise question upon which the court ultimately had to pass.' " *State* v. *Beavers*, supra, 290 Conn. 415, quoting *State* v. *Vilalastra*, 207 Conn. 35, 41, 540 A.2d 42 (1988). Such a situation is not present in this case, and we conclude that the trial court did not abuse its discretion in precluding the plaintiff's expert from testifying.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other justices concurred.