******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SUE NADEL *v.* STEVEN LUTTINGER
(AC 37763)

Beach, Sheldon and Mullins, Js.

*Argued April 11—officially released October 4, 2016*

(Appeal from Superior Court, judicial district of Stamford-Norwalk, Hon. Stanley Novack, judge trial referee [dissolution judgment]; Heller, J. [motion for contempt].)

*Samuel V. Schoonmaker IV*, with whom, on the brief, was *Wendy Dunne DiChristina*, for the appellant (defendant).

*Steven R. Dembo*, with whom were *Caitlin E. Kozloski* and, on the brief, *P. Jo Anne Burgh*, for the appellee (plaintiff).

*Opinion*

BEACH, J. In this postdissolution action, the defendant, Steven Luttinger, appeals from the judgment of the trial court granting in part the motion for contempt filed by the plaintiff, Sue Nadel. He claims that the court erred in (1) categorizing a cash performance award received by the defendant as an asset to be distributed as property pursuant to the separation agreement, rather than as earned income to be distributed pursuant to provisions regarding alimony, and (2) finding the amount owed to the plaintiff. We disagree with the defendant's first claim, but agree with the second.

The following facts and procedural history are relevant. The parties were married in November, 1991. The plaintiff filed for dissolution and, on December 17, 2013, a hearing was held. At that time, the parties presented a separation agreement to the court, *Hon. Stanley Novack*, judge trial referee. The dissolution judgment, which was rendered on January 8, 2014, incorporated by reference the parties' December, 2013 separation agreement.

The agreement provided for alimony and for the division of property. Alimony was addressed in paragraph 2 of the agreement. Paragraph 2B provided that alimony was to be calculated with reference to the defendant's "earned income." The amount of the obligation was determined by a sliding scale: "(1) On the first $250,000 of [the defendant's] earned income, both cash and non-cash, [the plaintiff] will receive 25%; (2) On $250,001 to $500,000 of [the defendant's] earned income, both cash and non-cash, [the plaintiff] will receive 20%; (3) On $500,001 to $750,000 of [the defendant's] earned income, both cash and non-cash, [the plaintiff] will receive 15%; (4) On $750,001 to $1,000,000 of [the defendant's] earned income, both cash and non-cash, [the plaintiff] will receive 10%; (5) Over $1,000,000, [the plaintiff] will not share. (6) Connecticut General Statutes § [46b-86 (b)] shall apply." Paragraph 2C defined the defendant's "earned income" as "all amounts paid to him for his personal services, including: wages, commissions, bonuses, consulting fees, finder's fees, or any other type of compensation both cash and non-cash he has the right to receive for his personal services."

Paragraph 2D provided that the defendant's "earned income will include both cash and non-cash compensation; provided, however, that [the plaintiff's] entitlement to a percentage of [the defendant's] earned income will be satisfied first out of all cash paid to [the defendant] during a calendar year . . . . If [the defendant] should voluntarily defer any cash compensation, or shall voluntarily elect non-cash compensation in lieu of cash, then in that event, he shall be deemed to have received the voluntary deferral in cash."

The agreement contained other provisions regarding

alimony that are not directly relevant here. It is clear from the agreement, then, that the plaintiff was entitled to a decreasing percentage share of the defendant's earned income as the amount of his income rose, and the agreement contemplated that both cash and non-cash remuneration would be subject to alimony.

Obligations as to property division were addressed in paragraph 5. Paragraph 5A provided that ten specifically listed financial assets, not including the award in issue in this case, were to be divided equally at the time of dissolution.

Paragraph 5B is critical to the analysis of this case. The heading of the paragraph is "AMC[1] Restricted Stock Awards and Units (husband)." The paragraph provides: "The division of assets as equitable distribution shall include all restricted stock units and options that have been awarded to [the defendant] through the date of the dissolution of the marriage, including non-vested RSU's[2] and options. If and when non-vested awards of any kind become vested, then the [plaintiff] shall forthwith be entitled to her share thereof net of all applicable taxes based on the tax rate from the year in which the applicable taxes are imposed. Within 7 days after RSU's vest, the [plaintiff] shall receive her share, taking into account any appreciation or depreciation of said shares. Within 30 days after the filing of the [defendant's] tax return in which the receipt of the restricted stock units are reflected, the parties shall 'true-up' in order to share equitably the tax burden on the vesting of the RSU's." Although paragraph 5B does not expressly state how the parties were to divide the net proceeds of assets subject to the paragraph, the parties agreed that such assets were to be divided evenly between them.

During the relevant times, the defendant was employed by AMC. He participated in two incentive programs. One, the "AMC Networks Restricted Share Awards," though not directly in issue in this appeal, has been referred to by the parties, and facts concerning the program appear in the record. Pursuant to that program, the defendant received in 2011 a total of 4250 shares of restricted AMC stock, which did not vest until March, 2014. The defendant considered this stock award to be property pursuant to paragraph 5B and paid the plaintiff accordingly. There is no dispute regarding this transaction.

The second incentive program forms the context of the present appeal. In March, 2011, AMC notified the defendant that he had been selected to receive a contingent cash award.[3] The fundamental term of the agreement was stated in paragraph one of the "Performance Award Agreement." The "target" amount of the award was $165,000; the exact amount was to be determined by the company after it determined the extent to which certain performance objectives were attained

in the 2013 calendar year.

The defendant received the cash proceeds of the award in March, 2014. The gross amount of the award was $222,915. After taxes were deducted, the net amount received by the defendant was $140,503.33. Although there are some misleading characterizations on several brokerage statements, it was agreed that the "Restricted Share Awards," referred to previously, were transactions in shares of company stock, while the "Performance Awards," the subject of this appeal, were entirely cash transactions. The defendant treated the AMC cash performance award as earned income and, accordingly, paid the plaintiff a percentage of that award pursuant to paragraph 2B of the separation agreement, which concerns alimony.[4]

In April, 2014, the plaintiff filed a postjudgment motion for contempt. The plaintiff sought to have the defendant held in contempt for treating the cash performance award as earned income and paying her a percentage of the award as alimony pursuant to paragraph 2B of the separation agreement. She argued at the contempt hearing that the cash award was an asset granted to the defendant prior to the entry of the judgment of dissolution and, thus, that the defendant should have paid her 50 percent of the cash performance award according to paragraph 5 of the separation agreement.

Following a hearing on the plaintiff's motion for contempt, the court, *Heller*, *J.*, determined that the cash performance awards had been granted to the defendant during the marriage, were "non-vested awards" within the meaning of paragraph 5B and, upon vesting, the defendant was obligated to pay the plaintiff her share. The court noted that, according to the testimony of the parties, they had agreed to divide property assets within paragraph 5 equally, although paragraph 5 did not expressly so state. The court found that the separation agreement did not clearly provide for the equal division of such assets; thus, the court did not find the defendant in contempt. The court concluded that the plaintiff was entitled to 50 percent of the cash award and granted the plaintiff's motion for contempt to the extent that it sought an order directing the defendant to pay the difference between 50 percent of the cash performance award, net of applicable taxes, and the amount that he already had paid to her. The court ordered the defendant to pay the plaintiff $55,728.75 and did not find the defendant in contempt.

Pursuant to a June, 2015 order by this court, the trial court issued an articulation. The court clarified its finding that the cash performance award was not an award of a restricted stock unit, but rather was a non-vested award pursuant to paragraph 5B of the separation agreement. It further stated that the amount of its award of $55,728.75, made after finding that the plaintiff was entitled to one half of the net cash performance

award, was reached because the court credited the plaintiff's conclusion in her testimony that that's what she was owed.

I

The defendant's principal claim is that the court erred in categorizing his postjudgment performance cash award as property to be distributed according to the provisions of paragraph 5B of the separation agreement, rather than as earned income subject to paragraph 2C. The defendant argues that the plain and unambiguous language of the separation agreement compels the conclusion that the cash award was a form of income under paragraph 2C, which expressly included "bonuses" within its definition of earned income. Earned income, of course, was subject to distribution as alimony rather than as property. We disagree, and hold that, although the language of the separation agreement is clear and unambiguous, it compels the conclusion that the cash performance award was properly considered to be an asset subject to distribution pursuant to paragraph 5.

Both parties argue that paragraphs 2C and 5B are clear and unambiguous. The court agreed, and so do we. "Our interpretation of a separation agreement that is incorporated into a dissolution decree is guided by the general principles governing the construction of contracts. . . . A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . If the language of a contract is clear and unambiguous, the intent of the parties is a question of law, subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Eckert* v. *Eckert*, 285 Conn. 687, 692, 941 A.2d 301 (2008).

As stated previously, paragraph 2C defined the defendant's "earned income" as "all amounts paid to him for his personal services, including: wages, commissions, bonuses, consulting fees, finder's fees, or any other type of compensation both cash and non-cash he has the

right to receive for his personal services." The defendant argues that the payment in issue was clearly a "cash bonus," because it was a payment in cash, rather than shares of stock, the money was actually paid after the date of dissolution, and the cash performance award was not clearly within the definitions of property assets as provided in paragraph 5. The defendant also alludes to the description of the award as it appears in various financial statements.[5]

Paragraph 5B, which concerns property division, provides that "[t]he division of assets as equitable distribution shall include all restricted stock units and options that have been awarded to the [defendant] through the date of the dissolution of the marriage, including nonvested RSU's and options. If and when non-vested awards of any kind become vested, then the [plaintiff] shall forthwith be entitled to her share thereof net of all applicable taxes based on the tax rate from the year in which the applicable taxes are imposed. Within 7 days after RSU's vest, the [plaintiff] shall receive her share, taking into account any appreciation or depreciation of said shares."

The defendant argues that paragraph 5B applies only to distributions of stock, such as restricted stock options. He contends that the phrase "non-vested awards of any kind," in the context of paragraph 5B, refers to and applies only to those assets particularly described in the first sentence of the paragraph, which specifically mentions only nonvested restricted stock units and nonvested options.[6] He further argues that the heading of paragraph 5B, "AMC Restricted Stock Awards and Units," has some significance, despite the boilerplate language of paragraph 23.[7] The plaintiff contends that the language of paragraph 5B does not necessarily exclude nonstock transactions from the category of financial assets subject to distribution according to paragraph 5, because the phrase "non-vested awards of any kind," contemplates a broader scope. We agree with the plaintiff.

The first sentence of paragraph 5B states that the category of assets subject to division "shall include" certain restricted stock units. "[T]he word 'include' may be considered a word of limitation as well as a word of enlargement. . . . In *Hartford Electric Light Co.* v. *Sullivan*, [161 Conn. 145, 150, 285 A.2d 352 (1971)], we recognized that the most likely common use of the term 'shall include' is one of limitation. . . . In that case, however, we could not conclude with certainty that it was so employed." (Citations omitted.) *State* v. *White*, 204 Conn. 410, 422–23, 528 A.2d 811 (1987). In the present case, the context of the term "shall include" compels the conclusion that the term is not one of limitation. The first sentence mentions restricted stock units, but the term "non-vested awards of any kind," which appears in the next sentence, is very broadly phrased.

The use of the enlarging phrase indicates that the term "shall include" does not limit the applicability of paragraph 5B to only restricted stock units, but rather it apples to "non-vested awards of any kind," which were awarded, but not paid, during the marriage. A construction limiting the application of paragraph 5B to restricted stock units and options would render the words "of any kind" superfluous. *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 546, 893 A.2d 389 (2006) ("the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous" [internal quotation marks omitted]). If the plaintiff was entitled under the agreement to the appropriate share of "non-vested awards of any kind," and if the cash performance award was a non-vested award, then the cash performance award was subject to distribution under paragraph 5.

The second sentence also indicated that the plaintiff "shall forthwith" be entitled to her share of the "non-vested awards of any kind" upon the vesting of such awards. This provision sets forth a timetable different from that applicable to restricted stock units. According to the third sentence, the plaintiff shall receive her share within seven days of vesting, and, according to the fourth sentence, the parties were subject to a "true-up" provision. The parties, represented by counsel, easily could have specifically stated, for example, that paragraph 5 applied only to stock transactions, but they did not.

The performance award agreement, dated March 29, 2011, authoritatively explained the award and was introduced by the defendant at the contempt hearing. The agreement referred to the transaction as an "[a]ward" rather than a bonus. Paragraph 21 of the agreement stated that the award "shall be considered special incentive compensation and will be exempt from inclusion as 'wages' or 'salary' in pension, retirement, life insurance and other employee benefits arrangements of the Company and its Affiliates, except as determined otherwise by the Company." The language of the award itself supports the conclusion that the award is properly deemed to be something other than ordinary salary or a bonus.

The critical distinction, on a reading of the agreement as a whole, is not between cash and stock or between performance cash awards and restricted stock units. Rather, it is clear that nonvested awards made prior to dissolution, presumably recognizing service during the course of the marriage, were considered to be property, to be distributed accordingly. When the award vested, the net proceeds were, then, to be distributed equally between the parties. On the basis of the evidence presented at the contempt hearing, we do not conclude that the court's finding that the cash award was a "non-vested asset of any kind" under paragraph 5B was

clearly erroneous.[8] The evidence presented at trial makes clear that the cash award was granted during the marriage and vested after dissolution. Paragraph 5B pertains to assets that were granted during the marriage and vested after, and makes clear that when "non-vested awards of any kind" become vested, the plaintiff shall be entitled to her share net of all applicable taxes.

We recognize, finally, the defendant's argument that the court violated the rules of contract interpretation by examining extrinsic sources, such as footnotes on financial affidavits and a Fidelity report, to support its interpretation without first finding the separation agreement to be ambiguous. The court did reference such sources, but nothing prevents a court from considering evidence that tends to explain into what category a payment belongs. Although the agreement itself was properly determined to be clear and unambiguous, it was nonetheless incumbent on the court to determine the nature of the award in issue.

## II

The defendant next claims that even if this court affirms the trial court as to the first issue, the court's determination that the defendant owed $55,728.75 was clearly erroneous. He argues that the court erred in crediting the plaintiff's conclusory testimony that the amount due to her was $55,728.75, when that amount was 25 percent of the *total* bonus of $222,915 and did not account for taxes as required under paragraph 5B.[9] We agree.

"A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Considine* v. *Waterbury*, 279 Conn. 830, 858, 905 A.2d 70 (2006).

In its articulation, the court explained the method used for calculating the money owed as follows: "Having found that the [plaintiff] was entitled to half of the cash performance award payment that the [defendant] received on March 13, 2014, net of applicable taxes, the court credited the [plaintiff's] testimony that the balance due her was $55,728.75, and it ordered the [defendant] to pay that amount to the [plaintiff]."

The only evidence supporting the court's finding was the plaintiff's own conclusion, admitted into evidence without objection, that the defendant owed her $55,728.75. We have been directed to no evidence as to the amount of the award that the defendant paid to the plaintiff as alimony. The sparse evidence before the court in this regard did show, however, that the gross amount of the cash award was $222,915, and the net amount was $140,503. Under paragraph 2B, the amount of the defendant's obligation to pay alimony was vari-

able, depending on overall income.[10] The amount awarded, $55,728.75, is clearly 25 percent of $222,915, which was the *gross* amount of the cash award. Under paragraph 5B the plaintiff was entitled to her share of a nonvested award of any kind "*net of all applicable taxes* based on the tax rate from the year in which the applicable taxes are imposed." (Emphasis added.) We are left with a firm conviction that a mistake has been committed. The record shows that the net amount of the cash performance award was $140,503.33. The plaintiff, then, was entitled to one half of that amount, $70,251.67, less whatever the defendant previously paid as alimony.

The judgment is reversed only as to the amount of the award owed to the plaintiff and the case is remanded for further proceedings in accordance with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The defendant was employed by American Movie Classics, LLC, which hereinafter is referred to as AMC.

[2] The references in the agreement to RSU's are to restricted stock units.

[3] The defendant received similar performance awards in 2012 and 2013. This appeal specifically concerns only the 2011 award.

[4] It is not entirely clear from the record precisely what amount was paid.

[5] We note that documents other than the separation agreement are not properly to be referenced, for the purpose of construing the words of the agreement, unless the agreement is ambiguous. See *Isham* v. *Isham*, 292 Conn. 170, 180, 972 A.2d 228 (2009) ("[w]hen only one interpretation of a contract is possible, the court need not look outside the four corners of the contract" [internal quotation marks omitted]). The court of course properly may rely on extrinsic evidence to determine the factual characteristics of the actual payment, so that it can determine how and whether the distribution of the payment is regulated by the agreement.

[6] The court's finding that the cash performance award was not a stock transaction is not contested.

[7] Paragraph 23 of the settlement agreement provides: "<u>HEADINGS</u> The paragraph headings herein are for convenience only and shall not be construed to limit or in any way affect any provisions of this Agreement."

[8] The defendant also argues that an examination of the agreement as a whole, and in particular paragraphs 2D and 2E, supports his interpretation of the separation agreement. He notes that paragraph 2D indicates that voluntarily deferred cash compensation is part of the alimony calculation. He argues that involuntary cash bonus deferrals were not addressed in paragraph 2D because they were addressed in paragraph 2C. He notes that paragraph 2E, which provided that deferred noncash compensation granted within the alimony term was to be paid to the plaintiff according to the portion owed to her upon the defendant receiving the deferred payments, and includes noncash compensation granted in one year but paid in later years, as alimony not property. These provisions discuss cash and noncash compensation and how they fit into the alimony calculations. Significantly, the first sentence of paragraph 2E indicates that it refers to "non-cash compensation received by [the defendant] *going forward from the date of the decree* . . . ." (Emphasis added.) Both paragraphs 2D and 2E refer to events in the future. The court's findings, which were supported by evidence, that the cash award was a "non-vested [award] of any kind" under paragraph 5B and that the award was made prior to the dissolution, were not inconsistent with these provisions.

[9] The defendant also argues that the amount awarded is incorrect because the court failed to follow the "true-up" procedure in paragraph 5B. This argument assumes that paragraph 5B pertained only to restricted stock units and that the cash award was subject to the "true-up" provision. As stated in part I of this opinion, paragraph 5B did not pertain only to restricted stock units, but rather, pertained to restricted stock units and "non-vested awards of any kind." The final sentence of paragraph 5B required the parties to "true-up": "Within 30 days after the filing of the [defendant's] tax return in which the receipt of the restricted stock units are reflected, the parties

shall 'true-up' in order to share equitably the tax burden on the vesting of the RSUs." This sentence concerns restricted stock units. The court properly found that the performance cash award was not a restricted stock unit; thus, the sentence regarding truing up does not apply.

[10] Paragraph 2B also provides that if the defendant's earned income is over $1 million, the plaintiff's share of that as alimony is zero percent. Both parties testified at the contempt hearing that a certain percentage of the cash award was paid to the plaintiff as alimony; that specific amount, however, was not in evidence.

––––––––––––––––––––––