******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# BARBARA AYRES *v.* GEORGE AYRES
## (AC 41548)

DiPentima, C. J., and Alvord and Lavery, Js.

*Syllabus*

The defendant, whose marriage to the plaintiff previously had been dissolved, appealed to this court from the judgment of the trial court resolving a postjudgment motion for contempt filed by the plaintiff. The parties' separation agreement included payment of alimony to the plaintiff calculated from the defendant's gross income of base pay and performance based bonuses, and a provision stating that income shall not include stock that may be awarded to either party. In 2011, the defendant was hired by a company that was acquired by V Co., and he accepted a position with V Co. that included a retention plan, which included short-term incentives, long-term incentives, including both restricted stock units that would be payable in the form of stock and performance stock units that would be payable in the form of cash, and a severance package. In August, 2015, the defendant's employment with V Co. was terminated, and he received a severance payment, after which he found higher paying employment and adjusted his alimony payment accordingly. In July, 2014, the plaintiff filed a motion for contempt, alleging, inter alia, that the defendant failed to amend support based on the total reported for his income. There were three court rulings as to this motion, the last of which declined to find the defendant in contempt but ordered, inter alia, the defendant to include all past long-term incentive payments and the severance payment from V Co. in the calculation of gross income and to recalculate past alimony owed to the plaintiff. From that decision, the defendant appealed to this court, claiming, inter alia, that the trial court improperly interpreted a provision in the parties' separation agreement governing alimony to require that restricted stock units and performance stock units received from the defendant's employer be included within the alimony calculation. *Held:*

1. The trial court erred in ordering the defendant to include all past and future restricted stock unit payments in the calculation of gross income under the alimony provision, as the separation agreement unambiguously excluded stock from the alimony calculation: the separation agreement required an annual exchange of income tax returns for purposes of establishing the actual gross income for the previous calendar year, which the parties understood included any additional bonus income received and, thus, the annual alimony calculation was performed using the income the parties received during the previous calendar year, and during the calendar years at issue, the evidence showed that the distributions received by the defendant pursuant to the restricted stock unit program consisted of shares of V Co.'s common stock, which is unambiguously excluded from the alimony calculation; moreover, the plaintiff's claim that the alimony exclusion for stock excludes only nonperformance based awards of stock was unavailing, as the parties could have included language to that effect if they had intended for the alimony exclusion for stock to be so limited, and to define the stock exclusion to be limited to nonperformance based stock awards would render the stock exclusion wholly unnecessary.

2. The defendant could not prevail on his claim that the trial court erred in finding that performance stock units are not stock, as the defendant's vested performance stock units were designed to be distributed in cash, all distributions of the defendant's performance stock units were made in cash, and, thus, the defendant did not receive stock pursuant to the performance stock unit component of the long-term incentives program; moreover, the record did not support the defendant's claim that performance stock units were neither base pay nor performance based bonuses and, therefore, did not fall within gross income for purposes of the calculation of alimony under the separation agreement, and although the defendant presented testimony that the long-term incentives programs are golden handcuffs designed to keep an individual with the company, not to give them a bonus for performance, the court was not

required to credit that testimony or to find that a golden handcuff is not normally a form of bonus.

3. The trial court improperly interpreted gross income, which included only base pay and performance based bonuses, to include the defendant's severance payment; although the amount of the defendant's severance payment was determined by his base pay and eligibility for the short-term incentives plan, the severance payment was distinct from both base pay and performance based bonuses and, therefore, did not fall within the definition of gross income pursuant to the separation agreement.

Argued May 15—officially released October 1, 2019

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Litchfield, where the court, *Hon. Charles D. Gill*, judge trial referee, rendered judgment dissolving the marriage and granting certain other relief; subsequently, the court, *Bentivegna, J.*, denied the plaintiff's motion for contempt and issued certain orders requiring the defendant to recalculate past alimony owed to the plaintiff, and the defendant appealed to this court. *Reversed in part*; *judgment directed.*

*Jeffrey D. Ginzberg*, for the appellant (defendant).

*Stephanie M. Weaver*, for the appellee (plaintiff).

*Opinion*

ALVORD, J. In this marital dissolution action, the defendant, George Ayres, appeals from the trial court's postdissolution order resolving the motion for contempt filed by the plaintiff, Barbara Ayres. On appeal, the defendant claims that the court erred in interpreting the provision of the parties' separation agreement governing alimony to conclude that (1) the payment of long-term incentives, including restricted stock units and performance stock units, received from his employer were included within the alimony calculation and (2) a severance payment was included within the alimony calculation. We agree with the defendant's claims as to the restricted stock units and severance pay and, accordingly, reverse in part the judgment of the trial court.

The record reveals the following facts and procedural history. The parties were divorced on November 9, 2010. The dissolution judgment incorporated by reference a separation agreement executed by the parties on that date (separation agreement). Section 3.2 of the separation agreement governs alimony and provides in relevant part: "At the earlier of such time as the marital residence is sold, or beginning December 1, 2010, the [defendant] shall pay periodic alimony to the [plaintiff] for the duration set forth in paragraph 3.1, and which shall be calculated to be an amount which equals thirty percent of the [defendant's] gross income minus twenty percent of the [plaintiff's] gross income. Should the [defendant] be self-employed his income for the purposes of this calculation shall be based upon a minimum gross self-employment income of $80,000 to reflect his earning capacity and the [plaintiff's] income shall be not less than $25,000 to reflect her earning capacity; so that alimony under this calculation will be $19,000 annually.

"Each party's gross income for the purpose of this calculation shall be the party's gross income from their base pay and any performance based bonuses received. Income shall not include moving expenses, any car allowance, sign on stock options or stock which may be awarded to either party." Section 3.4 of the separation agreement provides, in relevant part: "The parties shall exchange income tax returns each year by May 1 for the purpose of establishing the actual gross income for the previous calendar year, which the parties understand will include any additional bonus income which was received by either party in the previous calendar year. Thereafter they shall determine if an adjustment in the support payment between the parties is necessary so as to meet the formula established. Any additional payments by the [defendant] or reimbursements by the [plaintiff] shall be made by the parties by June 1 of that year unless otherwise agreed."

At the time of the dissolution, the defendant was self-employed as a consultant. He worked for a number of companies, including Hughes Telematics, Inc., which hired him as an employee in August, 2011. Verizon Communications (Verizon) subsequently acquired Hughes Telematics, Inc., and the defendant was hired as a Verizon employee. When Verizon offered him the position, it also offered him a nonnegotiable retention plan, which included short-term incentives (STI), long-term incentives (LTI), including both restricted stock units (RSUs) that would be payable in the form of stock and performance stock units (PSUs) that would be payable in the form of cash, and a severance package. The defendant's employment with Verizon was terminated effective August 14, 2015, and he received a severance payment in the amount of $159,250, which represented twenty-six weeks of base pay ($227,500 annually), plus twenty-six weeks of STI ($91,000 annually). He was unemployed for seven weeks before obtaining employment with IBM on October 5, 2015. The defendant paid alimony at the Verizon rate through September, 2015, while he was unemployed and after receiving his severance payment. Beginning in October, 2015, the defendant paid alimony at the IBM rate, which was higher than the Verizon rate.

On July 30, 2014, the plaintiff filed a motion for contempt, alleging, in relevant part, that despite the separation agreement provision that requires the parties to amend spousal support for each year by exchanging income tax returns with proof of income, "the defendant has refused to amend support based upon the total reported for his income." The motion for contempt and the interpretation of the alimony provision have been the subject of three court rulings, only the third of which is challenged in the present appeal.

The first decision was issued by the court, *Moore, J.*, on May 15, 2015 (*Ayres I*). At issue were two STI payments, a 2013 payment in the amount of $72,800 in 2013 and a 2014 payment in the amount of $100,100, both of which were paid in cash. In its ruling, the court found that the STI payments constituted "performance based bonuses" within the meaning of the alimony provision and, thus, ordered that the STI payments be included in the calculation of spousal support paid by the defendant. In reaching this decision, the court found the term "performance based bonuses" within the alimony provision clear and unambiguous. Rejecting the defendant's argument that "performance based bonuses," within the context of the separation agreement, referred only to bonuses paid by the employer on the basis of the defendant's individual performance, the court found that the term included amounts paid on the basis of the company's performance. Noting testimony that STI payments were cash payments, the court stated that "no issues are raised as to whether an STI

payment might be excluded from the definition of 'performance based bonus' as stock."

On December 23, 2016, the court, *Dooley, J.*, issued a second ruling (*Ayres II*) regarding the alimony provision, which addressed the portion of the provision (alimony exclusion) that states that "[i]ncome shall not include moving expenses, any car allowance, sign on stock options or stock which may be awarded to either party." The court found the alimony provision clear and unambiguous and addressed only the issue of whether the separation "agreement excludes all stock or only sign on stock from the definition of gross income." It specifically did not decide whether RSUs or PSUs were, in fact, stock, nor did it decide the issue of whether "the [LTI] proceeds should be treated identically to the [STI] proceeds because they are 'bonuses based upon the longer employment of the defendant.' " In its ruling, the court agreed with the defendant that " 'sign on' applies only to stock options and that 'stock which may be awarded to either party,' regardless of when it is awarded, is excluded from the definition of gross income." The court directed the parties to contact the caseflow coordinator to schedule a hearing on the issue of whether the LTIs are stock.

That hearing was held on September 26 and 27, 2017. The court, *Bentivegna, J.*, also heard the issue of whether the defendant's severance payment received following the 2015 termination of his employment with Verizon should be included in the alimony calculation.[1] In addition to the testimony of the plaintiff and the defendant, the defendant presented the testimony of an expert in executive compensation, Attorney Bruce Barth.

After receiving posttrial briefs from both parties, the court issued its memorandum of decision on February 28, 2018. The court indicated that it would treat *Ayres I* and *Ayres II* as the law of the case.[2] Like the two prior decisions, the court also concluded that the language of the alimony provision is clear and unambiguous. The court determined that the RSUs and PSUs were "performance based bonuses" and, therefore, were included in the alimony calculation set forth in the alimony provision. It further concluded that the RSUs and PSUs were not stock under the alimony exclusion. Lastly, the court concluded that the defendant's severance payment also must be included in the alimony calculation.

Finding that the defendant's conduct was not wilful, the court declined to hold the defendant in contempt. It issued remedial orders requiring the defendant to "include all past LTI payments and the 2015 severance payment in the calculation of 'gross income' under [the alimony provision] and to recalculate past alimony owed to the plaintiff pursuant to the alimony formula set forth in the [separation] agreement." The court also

ordered "the defendant to include all future LTI payments from Verizon in the definition of gross income under [the alimony provision] so as to ascertain the amount of alimony owed by the defendant to the plaintiff for the duration of his alimony obligation under the [separation] agreement." This appeal followed.[3]

The defendant's claims on appeal involve questions of law and fact. Our standards of review are well settled. "In a marriage dissolution action, an agreement of the parties executed at the time of the dissolution and incorporated into the judgment is a contract of the parties. . . . The construction of a contract to ascertain the intent of the parties presents a question of law when the contract or agreement is unambiguous within the four corners of the instrument. . . . The scope of review in such cases is plenary . . . [rather than] the clearly erroneous standard used to review questions of fact found by a trial court." (Internal quotation marks omitted.) *Steller* v. *Steller*, 181 Conn. App. 581, 588–89, 187 A.3d 1184 (2018). Both parties maintain that the alimony provision is clear and unambiguous. Each of the trial courts that has considered the provision has agreed, and so do we. Because the language of the alimony provision in the present case is clear and unambiguous, our review is plenary. See *Dejana* v. *Dejana*, 176 Conn. App. 104, 117–18, 168 A.3d 595 (whether court properly concluded that separation agreement unambiguously provided that defendant could use existing and future LTIP income toward payment of college expenses presented question of law subject to plenary review), cert. denied, 327 Conn. 977, 174 A.3d 195 (2017).

The determination of the nature of the payments at issue is factual; therefore, the clearly erroneous standard of review is appropriate. See *Nadel* v. *Luttinger*, 168 Conn. App. 689, 700 147 A.3d 1075 (2016) (applying clearly erroneous standard of review to court's finding that cash award was a "nonvested asset of any kind" under clear and unambiguous provision of separation agreement). "[T]he trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Isenburg* v. *Isenburg*, 178 Conn. App. 805, 813, 177 A.3d 583 (2017), cert. denied, 328 Conn. 916, 180 A.3d 963 (2018).

I

We address the defendant's first two claims together because they are interrelated. The defendant claims that

the court erred in interpreting the alimony provision to require that RSUs and PSUs be included within the alimony calculation. Specifically, he argues that RSUs and PSUs are neither base pay nor performance based bonuses. In the alternative, he argues that even if the RSUs and PSUs are performance based bonuses, they are nevertheless excluded from the alimony calculation on the basis that they are stock. As to the RSUs, we conclude, contrary to the trial court, that the payments received by the defendant through the RSU component of the LTI program constitute stock within the meaning of the alimony exclusion.[4] As to the PSUs, we conclude that the court properly determined that they are performance based bonuses and not stock.

In its memorandum of decision, the court, recognizing that the separation agreement did not define the term stock, consulted Black's Law Dictionary, which defines stock as: "[A] proportional part of a corporation's capital represented by the number of equal units (or shares) owned, and granting the holder the right to participate in the company's general management and to share in its net profits or earnings."[5] (Internal quotation marks omitted.) In their appellate briefs, both parties also have offered this definition.

The court then stated: "The evidence shows that the RSUs and PSUs are not common stock of the company. PSU and RSU represent a hypothetical share of Verizon's common stock. Stock units are called stock equivalents in the industry. Stock is an actual ownership interest in the company; while a stock unit is a phantom ownership interest in a company. The LTIs are not 'stock' that are excluded from the alimony calculation. See *Ayers II*." (Footnote omitted.)

The evidence before the court, on the issue of whether LTIs are stock, primarily consisted of documents issued by Verizon and Barth's expert testimony. See *Nadel* v. *Luttinger*, supra, 168 Conn. App. 699 (considering, inter alia, language of performance award agreement to determine nature of award for purposes of categorization under provisions of unambiguous separation agreement). Barth reviewed documentation provided by Verizon regarding the LTI program, including the July 27, 2012 letter setting forth the defendant's employment agreement with Verizon, which explained generally the defendant's base compensation, STI plan, LTI plan,[6] and Verizon severance program, among other benefits. According to Barth, under the terms of the employment agreement, both RSUs and PSUs are stock units, which are hypothetical shares of Verizon's common stock. In industry terms, stock units would be called "stock equivalents." Barth testified that "stock is an actual ownership interest in a company," whereas "[a] stock unit is a phantom ownership interest in a company." Barth testified that the value of the LTIs was tied to the value of Verizon stock on a particular day.

Specifically, the LTIs in the present case were based on the fair market value on the date of the grant of the stock of the company. Acknowledging that RSUs are payable in stock while PSUs are payable in the form of cash, Barth opined that payment in cash does not change the nature of PSUs as a stock equivalent.

A document titled "2009 Verizon Communications Inc. Long-Term Incentive Plan (As Amended and Restated)" (2009 plan) was entered into evidence. Following its approval by shareholders, the 2009 plan authorizes the grant of RSUs and PSUs as "Awards," which term is defined to include "Nonqualified Stock Options, Incentive Stock Options, Restricted Stock, Restricted Stock Units, Performance Shares, Performance Units, or other Awards." The 2009 plan defines "Share" as "a share of common stock of the Company," and "Share Pool" as "the number of Shares available under [§] 4.1 hereof, as adjusted pursuant to [§§] 4.2 and 4.3 hereof." Section 4.1 governs the "Number of Shares Available for Grants" and states that "there shall be reserved for issuance under Awards 115,000,000 Shares." Barth testified that the 115,000,000 shares referenced in § 4.1 make up Verizon's common stock. Section 4.2 of the 2009 plan governs "Share Pool Adjustments" and identifies the Awards that "shall reduce, on a Share-for-Share basis, the number of Shares available for issuance under the Share Pool." Included in that list is "An Award of Restricted Stock;" "An Award of a Restricted Stock Unit payable in Shares;" "An Award of a Performance Share;" "An Award of a Performance Unit payable in Shares;" and "Other Awards payable in Shares." Absent from the list is an award of a performance unit payable in cash.

Article 7 of the 2009 plan governs "Restricted Stock and Restricted Stock Units." RSU is defined in the 2009 plan as "an Award granted pursuant to [§] 7.5 hereof." Section 7.5 provides, in relevant part: "In lieu of or in addition to any Awards of Restricted Stock, the Committee may grant Restricted Stock Units to any Participant, subject to the terms and conditions of this Article 7 being applied to such Awards as if those Awards were for Restricted Stock and subject to such other terms and conditions as the Committee may determine. Each Restricted Stock Unit shall have an initial value that is at least equal to the Fair Market Value of a Share on the date of grant. Restricted Stock Units may be paid at such time as the Committee may determine in its direction, and payments may be made in a lump sum or in installments, in cash, Shares, or a combination thereof, as determined by the Committee in its discretion . . . ."

Article 8 of the 2009 plan governs "Performance Units and Performance Shares." "Performance Unit" is defined in the 2009 plan as "an Award granted pursuant to Article 8 hereof, which shall have an initial value

established by the Committee on the date of grant." Section 8.2 further provides that "[e]ach Performance Unit shall have an initial value that will not be less than the Fair Market Value of a Share on the date of grant." Section 8.4, titled "Form and Timing of Payment of Performance Units/Shares," states in relevant part: "Subject to the terms of the Plan, the Committee, in its discretion, may direct that earned Performance Units/Shares be paid in the form of cash or Shares (or in a combination thereof) that have an aggregate Fair Market Value equal to the value of the earned Performance Units/Shares on the last trading day immediately before the close of the applicable Performance Period."

The Verizon RSU agreements authorized by the 2009 plan also were admitted into evidence. The RSU agreement for the 2012-2014 award cycle provides that "[t]he Participant is granted the number of RSUs as specified in the Participant's account under the 2012 RSU grant, administered by Fidelity Investments or any successor thereto ('Fidelity'). A RSU is a hypothetical share of Verizon's common stock. The value of a RSU on any given date shall be equal to the closing price of Verizon's common stock on the New York Stock Exchange . . . . as of such date." The RSU Agreement for the 2012-2014 cycle further provides that "[a]ll payments under this Agreement shall be made in shares of Verizon common stock, except for any fractional shares, which shall be paid in cash. . . . The number of shares that shall be paid . . . shall equal the number of vested RSUs. . . . Once a payment has been made with respect to a RSU, the RSU shall be canceled; however, all other terms of the Agreement, including but not limited to the Participant's Obligations, shall remain in effect." Under a provision titled "Shareholder Rights," the RSU agreement states that "[t]he Participant shall have no rights as a shareholder with respect to the RSUs until the date on which the Participant becomes the holder of record with respect to any shares of Verizon common stock to which this grant relates. Except as provided in the Plan or in this Agreement, no adjustment shall be made for dividends or other rights for which the record date occurs while the RSUs are outstanding." The agreements for the 2013-2015 award cycle, 2014-2016 award cycle, and 2015-2017 award cycle all contain identical or nearly identical provisions.

The Verizon PSU agreements authorized by the 2009 plan also were admitted into evidence. The PSU agreement for the 2013-2015 award cycle provides that "[t]he Participant is granted the number of PSUs as specified in the Participant's account under the 2013 PSU grant, administered by Fidelity Investments or any successor thereto ("Fidelity"). A PSU is a hypothetical share of Verizon's common stock. The value of a PSU on any given date shall be equal to the closing price of Verizon's common stock on the New York Stock Exchange . . . . as of such date." The PSU agreement also contains

vesting requirements based on the company's performance. The PSU Agreement for the 2013-2015 cycle further provides that "[a]ll payments under this Agreement shall be made in cash. . . . The amount of cash that shall be paid . . . shall equal the number of vested PSUs . . . *times* the closing price of Verizon's common stock on the [New York Stock Exchange] as of the last trading day in the Award Cycle. . . . Once a payment has been made with respect to a PSU, the PSU shall be canceled; however, all other terms of the Agreement, including but not limited to the Participant's Obligations and the Non-Competition Obligations, shall remain in effect." (Emphasis in original.) Under a provision titled "Shareholder Rights," the agreement states that "[t]he Participant shall have no rights as a shareholder with respect to the PSUs." The agreements for the 2014-2016 award cycle and 2015-2017 award cycle contain identical or nearly identical provisions.

A

We first address the defendant's challenge to the trial court's conclusion that RSUs are not stock. The defendant argues, inter alia, that "[t]he fact that the defendant was paid in stock further amplifies the logical conclusion that RSUs must be excluded from alimony. . . . Whether the stock award is termed RSUs or something else, there is no getting away from the fact that the defendant was awarded stock because RSUs were distributed in shares of stock, duly placed in his brokerage account." The plaintiff argues that the "units" awarded under the LTI program, as hypothetical shares of Verizon's common stock, do not constitute stock within the meaning of the alimony exclusion. We agree with the defendant that because he was awarded, and ultimately received, shares of Verizon's common stock, the RSU payments constitute stock within the meaning of the alimony exclusion.

As noted previously, the parties agree on the definition of stock used by the trial court, which defines the term as: "[A] proportional part of a corporation's capital represented by the number of equal units (or shares) owned, and granting the holder the right to participate in the company's general management and to share in its net profits or earnings." (Internal quotation marks omitted.)

The court failed to find determinative the fact that the RSU plan was an employee stock award vehicle. We agree with the trial court that the RSUs granted to the defendant *prior to vesting* are not shares of stock. Because the evidence showed that the distributions received by the defendant pursuant to the RSU program consisted of shares of Verizon's common stock, however, the defendant received stock, which is unambiguously excluded from the alimony calculation. Thus, the court erred in ordering the defendant to include his RSU payments in the calculation of gross income for

purposes of calculating the alimony owed to the plaintiff.

It is undisputed that the defendant received actual shares of Verizon's common stock following vesting of the RSUs. For example, pursuant to the RSU agreement for the 2012-2014 award cycle, on February 13, 2015, 2776.54 shares of Verizon's common stock were deposited into the defendant's Fidelity brokerage account. Similarly, pursuant to the RSU agreement for the 2013-2015 award cycle, on February 12, 2016, 1036.34 shares of Verizon's common stock were deposited into the defendant's Fidelity brokerage account.[7] Thus, through the RSU component of the LTI program, the defendant received shares of Verizon's common stock.

Moreover, the documents issued by Verizon further support the conclusion that the defendant received stock within the definition of that term proffered by the parties. First, the RSU agreements show that, upon payment of Verizon's common stock, the RSU is cancelled and the defendant acquires shareholder rights. Pursuant to the RSU agreements, the defendant had no rights as a shareholder "until the date on which [he became] the holder of record with respect to any shares of Verizon's common stock to which [the] grant [of RSUs] relates." Although the defendant must still comply with his obligations pursuant to the RSU agreements, the agreements provide that the RSUs are canceled upon payment. Second, the 2009 plan indicates that an award of a RSU payable in shares reduces, "on a Share-for-Share basis, the number of Shares available for issuance under the Share Pool."

The plaintiff argues that even if the LTIs are stock, the alimony exclusion applies only to items that are not incentive based. Therefore, she argues that the alimony exclusion for stock applies only to stock "received during the course of employment for purposes other than a performance based bonus." Because the LTIs in the present case are performance based, the plaintiff contends that they are required to be included within the gross income calculation. In support of this argument, she offers a framework under which there are three distinct categories of stock awards: (1) sign on stock; (2) stock "received during the course of employment for purposes other than a performance based bonus"; and (3) "stock awarded for purposes of a performance based bonus." She relies on dicta from *Ayres II*, which provides: "An employer might issue stock to its employees for a myriad of reasons, to include for length of service, as an incentive for future performance, as part of a profit sharing plan or others. Indeed, stock awards can be used as an additional and separate category of compensation, distinct from either 'base pay' or 'performance based bonuses.' "

The plaintiff's argument is that the alimony exclusion for *stock* excludes only *nonperformance based awards*

*of stock.* We decline to read into the alimony exclusion a limitation that its language does not support. Had the parties intended the alimony exclusion for stock to be limited only to nonperformance based awards of stock, they could have included language to that effect. To define the stock exclusion to be limited to nonperformance based stock awards would render the stock exclusion wholly unnecessary. According to the terms of the separation agreement, alimony is calculated using the parties' "gross income," which the separation agreement defines as "base pay" and "performance based bonuses." If stock is awarded neither as base pay nor on the basis of performance, it is not included within gross income and, therefore, is not included within the alimony calculation. We decline to interpret the alimony provision in a manner that would render the alimony exclusion for stock superfluous. "When interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." (Internal quotation marks omitted.) *Dejana* v. *Dejana*, supra, 176 Conn. App. 120.

The separation agreement requires an annual exchange of income tax returns for purposes of establishing the actual gross income for the previous calendar year, which "the parties understand will include any additional bonus income which was received by either party in the previous calendar year." Thus, the annual alimony calculation is performed using the income the parties received during the previous calendar year. During the calendar years at issue, the defendant received shares of Verizon's common stock. Because the separation agreement unambiguously excludes stock from the alimony calculation, the court erred in ordering the defendant to include all past and future RSU payments in the calculation of gross income under the alimony provision.

B

We next address the defendant's challenge to the trial court's finding that PSUs are not stock. He argues that PSUs, "[a]s stock units . . . do not fall within the formula for the alimony computation," and that the "conver[sion] into cash by Verizon" does not change the nature of the PSUs as stock awards. The plaintiff argues, inter alia, that " 'units' are not paid out in shares; they are paid in cash and deposited in cash." We agree with the plaintiff that because the defendant's vested PSUs were designed to be distributed in cash and were, in fact, distributed in cash, the payments from the PSUs do not constitute stock within the meaning of the alimony exclusion.

As discussed previously, although the defendant's vested RSUs were designed to be, and were, in fact, distributed to the defendant in shares of Verizon's common stock, all distributions of the defendant's PSUs

were made in cash. For example, pursuant to the PSU agreement for the 2013-2015 award cycle, on February 12, 2016, $42,815.16 was deposited into the defendant's Fidelity brokerage account. The "Transaction Details" indicated that no shares were deposited to the defendant's account. Similarly, pursuant to the PSU agreement for the 2014-2016 award cycle, $69,197.52 was deposited into the defendant's Fidelity brokerage account.[8] Again, no shares were deposited to the defendant's account. Thus, the defendant did not receive stock pursuant to the PSU component of the LTI program.

Moreover, the documents issued by Verizon further support the conclusion that the defendant did not receive stock pursuant to the PSU component of the LTI program. Although the 2009 plan authorized the issuance of PSUs to be "paid in the form of cash or Shares (or a combination thereof)," each of the PSU agreements issued by Verizon and accepted by the defendant specified that "[a]ll payments under [the agreements] shall be made in cash." Additionally, the PSU agreements indicate that the defendant has "no rights as a shareholder with respect to the PSUs." Given that the parties advance a definition of stock as, in part, "granting the holder the right to participate in the company's general management," the lack of shareholder rights weighs against a determination that the PSUs should be categorized as stock. Lastly, under the 2009 plan, an award of a performance unit *payable in shares* reduces, "on a Share-for-Share basis, the number of Shares available for issuance under the Share Pool," whereas an award of a PSU *payable in cash* does not.[9]

The defendant argues that "the conversion of assets into cash does not change the essential character of the asset for purposes of contract interpretation." In support of this argument, he cites *Denley* v. *Denley*, 38 Conn. App. 349, 353, 661 A.2d 628 (1995), which recognized that "[t]he mere exchange of an asset awarded as property in a dissolution decree, for cash, the liquid form of the asset, does not transform the property into income." In *Denley*, this court held that the trial court improperly had considered as income money the defendant received from the exercise of stock options he was awarded as property in the dissolution decree. Id., 354. In the present case, the defendant was not awarded stock that he received and subsequently converted to cash. Rather, he received cash pursuant to an LTI program that awarded him hypothetical shares of stock in the form of PSUs, which, from the date of their grant, were payable only in cash. See *Whitt* v. *Sherman International Corp.*, 147 F.3d 1325, 1327 (11th Cir. 1998) (A phantom stock is "[a] right . . . to receive an award with a value equal to the appreciation of a share of stock from the date the Phantom Stock is cashed out. . . . Phantom Stock programs are designed to provide executives with cash

payments equivalent to amounts they could receive under an actual stock option or similar program. . . . Phantom programs are based on phantom or hypothetical shares or units." [Internal quotation marks omitted.]); see also *Bunnell* v. *Netsch*, United States District Court, Docket No. 3:12CV03740 (L) (N.D. Tex. June 11, 2013) ("[p]hantom stock, is not actually 'stock' ").

Having concluded that the PSUs are not stock, we turn to the defendant's argument that the PSUs are neither base pay nor performance based bonuses and, therefore, do not fall within gross income for purposes of the calculation of alimony under the separation agreement. Specifically, citing Barth's testimony, he argues that PSUs are "a form of retention benefits, and a golden handcuff." The plaintiff responds that the golden handcuff characteristics of the PSUs do not exclude them from performance based bonuses. She argues that the LTI program, "whether or not its incentives act as a retention incentive, is tied to the company's longer term performance to which the defendant, and all those awarded compensation under the [LTI program], has contributed through their three year service history." We agree with the plaintiff.

In concluding that the PSUs fell under the definition of "performance based bonuses," the trial court found that "the LTI payments are based on performance, both explicitly (company's performance) and implicitly (individual employee's performance that benefits the company as a whole)." This determination is supported by ample evidence in the record, including brochures issued to the defendant explaining Verizon's LTIs, one of which provided that "[LTIs] are an integral part of your Total Rewards and provide you with the opportunity to share in our success over time. The value of your LTI award, combined with base pay and short-term incentives, offers a competitive total compensation package that enables our Company to attract and retain highly valued, top-performing, and experienced executives, like you." The 2009 plan, which authorized the issuance of the RSUs and PSUs, also provided: "The objectives of the Plan are to optimize the profitability and growth of the Company through long-term incentives that are consistent with the Company's goals and that link the interests of Participants to those of the Company's shareholders; to provide Participants with incentives for excellence in individual performance; to provide flexibility to the Company in its ability to motivate, attract, and retain the services of Participants who make significant contributions to the Company's success; and to allow Participants to share in the success of the Company." Thus, the trial court properly concluded that the PSUs are performance based, and the court did not err in determining that PSUs fall within the category of "performance based bonuses."[10]

Although Barth opined that the LTIs are golden hand-

cuffs, which are "designed to keep an individual employed, not to give them a bonus for performance," the trial court was not required to credit this testimony, nor was it required to credit Barth's testimony that a golden handcuff is not normally a form of bonus. The defendant's counsel conceded during oral argument before this court that the trial court's decision not to credit expert testimony is not reversible error. "[I]t is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Internal quotation marks omitted.) *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 243, 963 A.2d 943 (2009).

## II

Lastly, the defendant claims that the court erred in interpreting gross income, which included only "base pay" and "performance based bonuses," to include his severance payment. Specifically, he argues that his right to receive severance pay "was dependent upon his agreement to release Verizon from any and all liability arising from the termination, among other things." The plaintiff responds that the conditions imposed on the defendant's severance pay "do not place it outside of the definition of gross income." The plaintiff, noting that STI previously had been ordered to be included in the defendant's gross income for purposes of the alimony calculation, emphasizes that the severance payment "includes the corresponding STI payments associated with his weeks in that year associated with the company." We agree with the defendant.

In its memorandum of decision, the court noted that the separation agreement did not define severance pay and, thus, turned to the following dictionary definitions of the term: "[A]n allowance usually based on length of service that is payable to an employee on termination of employment" and "[m]oney (apart from back wages or salary) that an employer pays to a dismissed employee. The payment may be made in exchange for a release of any claims that the employee might have against the employer." (Internal quotation marks omitted.) The court concluded: "The evidence demonstrates that the severance payment should be included in the alimony formula. The severance payment the defendant received was determined by his base pay, service time, grade band and eligibility for STI plan regardless of performance. Base pay and STI payments are included in the alimony formula. In addition, the defendant paid alimony after he received his severance pay and while he was unemployed. He wrote severance in the note section of the September 2015 check. The court has concluded that the severance payment must be part of the alimony calculation inclusion for base pay and performance based bonuses."[11] (Footnote added.)

The court's findings as to the method of calculation of the severance pay are not clearly erroneous. Neither are its findings that the defendant paid alimony after he received his severance pay and while he was unemployed, and that he wrote severance in the note section of the aforementioned check. Those findings, however, do not support the conclusion that the severance pay was includable within the alimony calculation as base pay and/or performance based bonuses.[12] To the contrary, the evidence presented as to the characteristics of the defendant's severance pay, including evidence noted by the court that the defendant was required to sign a severance agreement that included a release, demonstrate that it is distinct from both base pay and performance based bonuses.[13]

Barth testified that severance generally is provided to employees as a termination payment for the employee's service with a company. Specifically, he opined that companies provide for severance at the beginning of employment as a way of retaining employees, in "that they know that they have something if they're involuntarily terminated . . . ." Barth testified that although the "amount of severance usually, not always, is determined based on someone's base pay . . . the severance itself is not base pay, it's termination pay." According to Barth, severance pay is distinct from base pay in that "it is not payment for services rendered."

The documentary evidence supports the conclusion that the defendant's severance payment does not fall within the specific categories of "base pay" or "performance based bonuses." The July 27, 2012 letter setting forth the defendant's employment agreement with Verizon provided with respect to the Verizon Severance Program: "In addition, commencing in 2012 you will be eligible for the Verizon Severance Program. This program generally provides that in the event you incur a Qualifying Separation (generally defined as an involuntarily termination by the Company for reasons other than death, disability or for cause), you will be entitled to receive a separation payment based on your weekly compensation (base salary and target STI award opportunity divided by 52) times 2 times years of service, with a 26 week minimum and 35 week maximum, subject to your execution and non-revocation of a release of claims acceptable to Verizon." The "separation payment," to which the defendant would be entitled only in the event that he both incurred a "qualifying separation" and executed "a release of claims acceptable to Verizon" is qualitatively different from the defendant's "base pay."

In the detailed severance agreement, which the defendant executed on July 27, 2015, he acknowledged and agreed: "I will receive payment(s) and benefits by voluntarily signing this Release that I otherwise would not receive. I understand that I am being separated from

the payroll and that I have been offered severance pay . . . and other benefits . . . in exchange for signing this Release." The release provided, in relevant part: "I am giving up my right to claim benefits and/or damages that relate to or arise from my employment with the Company and/or separation from employment with the Company." The defendant testified that he did not have to sign a release in order to receive his regular salary. The severance agreement also contained a callback provision that required him to return ninety percent of the payment were he to violate certain provisions of the severance agreement.[14] Barth testified that base pay would never be called back.

The plaintiff argues that because the severance payment partially is based on STI and STI was determined in *Ayres I* to be a performance based bonus, the severance pay should be included within gross income. The documentary evidence and testimony, however, showed that the component of severance corresponding with the defendant's STI was paid as a percentage of the *target* of his STI, regardless of performance.[15] Exhibit A to the severance agreement indicated prorated 2015 STI based on "67 [percent] of calendar year *Target* prorated through Last Day of Active Employment." (Emphasis added.) Barth testified: "[I]f your severance date is before the end of the applicable short-term incentive plan year and you otherwise make the short-term incentive plan's eligibility requirements for that year, i.e., you're eligible to be in the plan, then the amount is prorated based on your service during the year regardless of performance. If the company had hit a 150 percent of target, he wouldn't get any more money. If the company had hit 50 percent of target, he wouldn't get any less money. He's getting an amount based on target, and that's the amount that's used to calculate his severance."

We conclude that, although the amount of the defendant's severance payment was determined by his base pay and eligibility for STI plan, the severance payment was distinct from both base pay and performance based bonuses and, therefore, does not fall within the definition of gross income pursuant to the separation agreement.

The judgment is reversed only as to the orders to include the defendant's RSU distributions and severance payment in the definition of "gross income" under § 3.2 of the parties' separation agreement and the case is remanded with direction to vacate those orders. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] At the beginning of the second day of the contempt hearing on September 27, 2017, the defendant's counsel informed the court that he had filed a motion requesting that the plaintiff be precluded from raising the issue of whether the defendant's severance payment should be included in the alimony calculation. Because the plaintiff had filed her motion for contempt in 2014 and the defendant's employment was not terminated until 2015, he

contended that he was not on notice of her claim regarding his severance pay. He asked that the court schedule a hearing on the severance pay issue after the plaintiff filed a motion regarding severance. In the event the court allowed the plaintiff to extend her contempt filing to include the severance issue, he requested that he be permitted to recall his expert, Attorney Bruce Barth, to provide testimony on that issue. The court denied the defendant's preclusion motion and permitted the defendant to recall Barth. On appeal, the defendant does not claim error in the court's denial of his motion.

[2] The parties do not raise any challenges in this appeal regarding the trial court's treatment of *Ayres I* and *Ayres II* as the law of the case.

[3] On May 31, 2018, the defendant filed a motion for an articulation, which the court denied on June 18, 2018. The defendant then filed a motion for review with this court. This court, thereafter, granted review but denied the requested relief.

[4] Because we conclude that the payments received by the defendant through the RSU component of the LTI program constitute stock within the meaning of the alimony exclusion and are, therefore, excluded from the alimony calculation, we need not address the defendant's argument that the RSUs are not performance based bonuses.

[5] The court also consulted the online version of Merriam-Webster's Collegiate Dictionary, which defines stock as "[t]he proprietorship element in a corporation usually divided into shares and represented by transferable certificates." (Internal quotation marks omitted.) The court further provided definitions indicative of the common usage of the term: "A stock is a type of security that signifies ownership in a corporation and represents a claim on part of the corporation's assets and earnings," and "[s]tock means the Common Stock of the Company." (Internal quotation marks omitted.)

[6] The letter provided in relevant part: "Commencing with the 2012 plan year, you will be eligible to participate in the Verizon Long Term Incentive (LTI) Plan. Long-term incentive awards typically are granted during the first quarter of the year and consist of performance stock units (PSUs) and restricted stock units (RSUs). Each PSU and RSU represents a hypothetical share of Verizon's common stock. The target value of your full-year long-term incentive award opportunity will be 75 [percent] of your base salary or $170,625. For the 2012 plan year, you will receive the full value of your LTI grant (it will not be prorated). In addition, for the 2012 plan year only, your 2012 LTI award will be delivered in the form of RSUs. The grant date value of each RSU will be based on the closing price of Verizon's common stock on July 26, 2012, which was the date the merger was completed, or $44.46. These RSUs will vest, subject to the terms and conditions of the award agreement, at the end of 2014 and will be payable in shares of Verizon common stock (less applicable tax withholdings) at the same time long-term incentives are paid to other employees. Your RSUs will accrue dividend equivalents in the form of additional RSUs, which will vest and be paid at the same time and to the extent that the RSUs vest and are paid.

"You will receive a detailed communications package regarding your 2012 long-term incentive award opportunity following your acceptance of the terms of this offer. The RSUs will be subject to the terms and conditions of the Restricted Stock Unit Award Agreement in the form applicable to Verizon employees. As a condition to your entitlement to the 2012 LTI award, you will be required to accept the terms and conditions of the applicable award agreement, which contains certain non-solicitation and non-competition provisions."

[7] Similarly, pursuant to the RSU agreement for the 2014-2016 award cycle, 1100.240 shares of Verizon's common stock were deposited into the defendant's Fidelity brokerage account.

With respect to the 2015-2017 cycle, the RSUs were scheduled to vest in December, 2017. Thus, on the date of the hearing, no distributions had been made as to the 2015-2017 cycle.

[8] With respect to the 2015-2017 cycle, the PSUs were scheduled to vest in December, 2017. Thus, on the date of the hearing, no distributions had been made as to the 2015-2017 cycle.

[9] The defendant relies on *Nadel* v. *Luttinger*, supra, 168 Conn. App. 700, in support of his argument that PSUs are stock. In that case, the issue before this court was not whether the "cash performance award" received by the defendant constituted stock. Indeed, the court expressly noted that the trial court's finding that the cash performance award was "not a stock transaction" was not contested. Id., 698, n.6. Rather, the issue before this court in *Nadel* was the propriety of the trial court's finding that the cash performance award was a "non-vested award of any kind," and this court

concluded that the trial court's finding was not clearly erroneous. Id., 700.

The other cases relied on by the defendant do not inform our consideration of the issues in this appeal. See *McKeon* v. *Lennon*, 321 Conn. 323, 345, 138 A.3d 242 (2016) ("exercised *stock options* and *restricted stock* that has vested ordinarily should be considered components of a party's gross income *for purposes of calculating child support* because they constitute 'deferred or incentive-based compensation' " [emphasis added]); *Baldwin* v. *Baldwin*, 19 Conn. App. 420, 422–23, 562 A.2d 581 (1989) (gain realized by plaintiff from exercise of *stock options* was not income under ambiguous separation agreement term, where plaintiff testified that stock options were not to be included as income and parties had listed stock options on financial affidavits as assets and not income).

[10] The defendant argues that "[t]he trial court wrongly concluded that the defendant made the same argument for exclusion of LTI as he did for STI (based on personal performance)." In its memorandum of decision, the trial court noted "the defendant's argument that performance based bonuses is limited to the defendant's individual performance." The defendant correctly observes that he did not make this argument in his posttrial brief. We reject, however, the defendant's reading of the court's decision to suggest that it considered *Ayres I* as controlling the outcome of its decision regarding LTI. Although it stated that it "adopt[ed] the reasoning" of *Ayres I*, the court did not conflate STI with LTI and it expressly considered the evidence presented before it as to the characteristics of the LTI program in reaching a determination that its payments fell under the definition of performance based bonuses.

[11] The plaintiff acknowledges in her appellate brief that the amount of alimony the defendant owed on his severance payment would be reduced by the amount of alimony he paid for the seven weeks he was between employment.

[12] With respect to the notation "9/15 support-severance" that the defendant made on his check to the plaintiff, the defendant testified: "[M]y rationale [for writing the word severance on the check] was that, at the moment that I wrote that check, I had already secured an agreed employment with IBM, and so I knew I would have an October paycheck, and I didn't want any issues regarding alimony interruptions, and so I simply continued to pay at the Verizon rate one more month." The word "severance," according to the defendant, "referred to the basis for paying [the plaintiff alimony] in an [un]interrupted fashion. She knew that I had lost employment."

[13] Recognizing a lack of appellate authority on this issue, the plaintiff relies on the Connecticut child support guidelines inclusion of severance pay in its definition of gross income in support of her argument that the defendant was required to pay alimony on his severance payment. As our Supreme Court has explained, the child support guidelines "allocate a certain percentage of parental income to child support," resulting in "an allocation of resources between parents and children that the legislature has decided is the appropriate allocation." (Internal quotation marks omitted.) *McKeon* v. *Lennon*, supra, 321 Conn. 343. In seeking to preserve this allocation, "the determination of a parent's child support obligation must account for *all* of the income that would have been available to support the children had the family remained together." (Internal quotation marks omitted.) Id. Thus, our Supreme Court previously has "interpreted broadly the definition of gross income contained in the guidelines to include items that, in effect, increase the amount of a parent's income that is available for child support purposes." (Footnote omitted; internal quotation marks omitted.) Id. The present case involves the categorization of certain payments, for purposes of determining whether the defendant owes an obligation to pay alimony thereon, under provisions of the parties' separation agreement and, thus, is distinct from the categorization of income pursuant to the child support guidelines.

The plaintiff further relies on *Prieto* v. *Prieto*, Superior Court, judicial district of Fairfield, Docket No. FA-08-4023879 (July 26, 2010) (where separation agreement defined income as including "all severance package payments or any and all other termination packages regardless of how they are labeled," issue before court was whether severance package should be categorized as "gross annual base income" or "bonus" income), and *Rivera* v. *Rivera*, Superior Court, judicial district of Hartford, Docket No. HHD-FA-156057803-S (Jan. 8, 2016) (considering severance payments to be in nature of income, and considering such payments in making other orders including order for lump sum alimony), which are both distinguishable and, moreover, as Superior Court cases, are not binding precedent on this court.

[14] Paragraph 11 of the severance agreement provided in relevant part: "*I understand there will be consequences if I breach this Release*. If I break my promises in paragraphs 7-10 of this Release, I will not be entitled to receive any outstanding portion of the Severance Payment or other benefits and compensation described in Attachment A of this Release, and Verizon shall be entitled to recover from me any Severance Payment or other benefits and compensation already paid at the time of breach, less 10 [percent], without affecting the validity of this Release which will remain in full force and effect." (Emphasis in original).

[15] Exhibit A further provided with respect to any PSUs and RSUs granted but outstanding and unpaid on the date the defendant separated from service, he would be "eligible for payment of these outstanding and unpaid PSUs and RSUs subject to the terms and conditions of the applicable award agreements that [he] received and executed with the grants and the terms of the [2009 plan] and, with respect to the PSUs, subject to the attainment of the applicable performance targets (all terms and conditions of such award agreement will remain in effect and are not superseded by this Release)."